Mr. Ross? Yes, thank you, Your Honors. May it please the Court, and good morning, Your Honors. I'm Robert Ross, appearing on behalf of the plaintiffs' appellants, Eric Betts and Susan Betts. Your Honor, with the Court's permission, I'd like to reserve three minutes of time. Fine. Your Honors, in this case, the trial court found as a fact that no jury could conclude, could reasonably find that defendants knowingly and unreasonably disregarded an excessive or substantial risk of harm, by allowing these minors to, and by encouraging them to play tackle football without equipment. That was a specific finding made by the trial court, which was clearly contradicted by the record in this case. We had record evidence, direct evidence, and circumstantial evidence that the defendant officials understood the very specific, substantial, serious risk of injury here, and it came, literally, out of the mouths of defendants. In most of these deliberate indifference cases that we read, what we find is we get evidence from others, not from the defendants, but from others, and we infer from that evidence and try to impute actual knowledge onto the defendants themselves. How do you get around the idea that Eric volunteered to participate in a football game that he knew was a rough game, as opposed to being compelled to play in that game by the officials? Sure. Well, a couple of things. There are cases out there, including the Knight case, which comes from this Court, from the Third Circuit, where there was actually voluntary activity, and yet a finding of deliberate indifference. And more importantly, in that case, the police officers agreed. There was a stop. There was a police stop. The driver was intoxicated, as was the passenger. They agreed with the police officer that they could make it home. The driver drove home. The passenger decided to walk home in the cold. She eventually passed out, suffered hyperthermia, and a brain injury. Well, she volunteered to undertake that activity. Yes, but applying the same deliberate indifference standard. That was a voluntary activity, despite that she was intoxicated? Yes, it was. And in fact, it was the Scioto case, which was cited by the defendants in their brief down below. And the citation for that is 81 F sub 2nd 559. Where the plaintiff actually volunteered to wrestle with an older wrestler, an alumnus who came back. Volunteered. And in that case, the Court specifically referred to the Knight case to say, voluntary activity does not form a basis for denying a deliberate indifference claim. All right. Let's assume, for the sake of argument, that there's no significant distinction between voluntary or compulsory activity. How is this a substantial risk of harm? How many football injuries had occurred at the Lawrence Youth Development Center before this incident? We don't know the exact number, but what the record says is this. There were serious injuries, including rib injuries, children who were hit and had the wind knocked out of them, bone injuries, including to ankles, including to fingers. So we know from this record that there were multiple injuries. In, for example, the Scioto case, as well as in a case called Hillard, which is another deliberate indifference case, we had one prior instance which wasn't even as serious as the ultimate injury. But here, where we're talking about injuries to ribs, people being hit hard enough that they lose their breath, people who are suffering bone injuries. You're saying getting the wind knocked out of you is serious harm? Sure. I mean, if you're hit in the chest, if you're running and you're hit in the chest by another player, literally to the point that you get the wind knocked out of you and you can't breathe, well, that's a serious harm. You're being exposed to serious harm. I guess what I'm struggling with is what percentage of injuries would rise to the level of a substantial risk? Is it 5 out of 100? Is it 10 out of 100? I mean, this grievous harm, I mean, obviously your client suffered a grievous injury, but my reading of the record is that this was the first such injury. Is that not right? Where someone ended up as a quadriplegic. Or suffered any sort of paralysis. That's very similar to the Cioto case and the Hillard case, where in Cioto it was the first time that a wrestler had suffered quadriplegia as a result of wrestling. Similarly, in the Hillard case, where they had taped the students to the wall. They were playing a game called fly to the wall. They taped the student to the wall. There had only been one prior instance of someone being injured, and that was just a person who was frightened, because as she fell, the tape wrapped around her neck. Speaking of falling, the rule that you proposed would seem to put a very substantial crimp on athletic activities in youth development centers such as this. Supposing that Eric, rather than crashing head first into an opposing player, running down the field had simply tripped and fell, causing him severe head injuries. Is there a liability in a case like that? Your Honor, that might be a different scenario for the following reason. But you're saying that the guards knew there was a substantial risk in playing this game of football. They disregarded the risk and let the game play. They should be liable. Is that fairly accurate? If that happened when playing tackle football without equipment, then there would be liability. Because as the courts have said in other deliberate indifference cases, if the conduct had not been allowed, the injury wouldn't have occurred. You could say that about anything. The world is fraught with risk. There's a swimming pool at this facility. Isn't there a risk that if somebody dives in the shallow end, they're going to suffer paralysis? They need to get rid of the swimming pool for the kids? Sure, Your Honor, that is a risk. But if you take it to the next level, which our case is, what if there are no lifeguards there? I'm giving you a specific hypothetical. There were two supervisors at this football field. Pause in a situation where there are two supervisors and ten student inmates, and they want to swim on a Saturday. And one of those students goes and dives into the shallow end and hits his head and becomes paralyzed. Is that liable? Is there liability? There are at least two reasons, Your Honor, why there's not liability and why that situation is different. Number one, that would be a condoned activity. To go to the swimming pool, even though you know there's risk, to go to the swimming pool and to have these kids swim is a condoned activity at this facility. Diving headfirst into the shallow end is a condoned activity? Oh, I'm sorry. You said diving headfirst. It would be liability if this. If the supervisors knew that these children were doing it, encouraged them to do it, and allowed them to do it. They're encouraging them to swim. They're not encouraging them to dive headfirst. In your case, they're encouraging them or allowing them to play football. They're not telling them that they must use their head as a battering ram. No, they're doing a little more than that because the record evidence in this case is that these guards allowed them to play this tackle football as a means of taking out their aggression on the other kids because they were otherwise fighting. So instead of fighting, I want you to get at them on the field. You can be rough, you can punish them, you can hit them as hard as you want. So they're actually condoning activity, which number one, they know, at least they say, they knew not to be allowed at the facility. They're actually condoning it. And number two, they're telling these kids, be that aggressive, be that rough, because instead of fighting, we'd rather you get at them this way. Isn't the weight room a way to take out their aggression? This facility has a weight room. Is the weight room to be banned as well? No, it's a way to take out their aggression, but it's not something that in their own minds they consider to be a significant risk of serious injury, a substantial risk of serious injury. Indeed, the director of the facility, Mr. Mitchell, he testified that, and I want to state his testimony precisely as he said it. He testified that it was a very obvious, and just so that I have this right, it was an unreasonable risk of harm, he called it. An unreasonable risk of harm and injury, and he said, I don't even have to tell these staff people that. Every one of them should know it, and if I ever saw it happen, I would stop it immediately. And there's a reason for it. Not of this particular injury. According to the Beer's opinion by this court, the court said you don't actually have to show that the defendant officials thought that this actual injury was going to happen. And Beer says very specifically, as long as it can be established, as long as it can be established, and I want to read the quote exactly. It says, it is enough that the official acted or failed to act, despite his knowledge of a substantial risk of harm. Plaintiff need not show that the prison official acted or failed to act, believing that the harm actually would befall. Let me ask you a slightly different question. I'm trying to get to contours. Supposing the youth development center, in order to teach the youth to get along together and to engage in teamwork, organized a baseball game, which I would think is very common, and kids do like to play baseball. So they have a baseball game, there's a batter up, and there's a strong pitch, and they're not wearing equipment, but the ball strikes them in the knee and cracks the kneecap. Would there be liability in a case like that? I mean, it would seem to me that, given your argument and the rule that you seem to be proposing, that the guards are liable. They would not for the following reasons. Number one, that activity is not an activity that's prohibited. Number two, it's not an activity that they themselves thought... And Mr. Mitchum testified to that. The other guards testified to that. In fact, it was a guard, Blue, who said, oh, we knew not to do that, because that would impose liability on the youth development center. Was there a formal rule at that center that said you shall not? Yes, sir. According to Mitchum, there was an actual rule that they should not undertake that activity. And he specifically said that there was training on that, that if he saw it, he would stop it. That's what makes it different. So what makes it different here is the presence or absence of a rule? In this instance, two things. Not only in this instance the presence of a ruling that they shouldn't do it, but more importantly, the direct understanding of these officials that they not only knew they shouldn't do it, but that it came with an unreasonable and substantial risk of harm. Those were the exact words they used. They said significant risk of harm. You didn't address this, I'm sorry to cut you off, but do you have a little time on sovereign immunity? Yes, Your Honor. On the issue of sovereign immunity... I'll tell you what, maybe it's better to do it on rebuttal, because your time is up. I thank you. Thank you, Mr. Ross. Mr. Knorr? Thank you, Your Honor. My name is John Knorr. I'm with the Pennsylvania Attorney General's Office, and I represent the appellees in this appeal. Okay, Mr. Knorr. So there's a rule there that says you shall not play football without protective gear. Is that right? Well, I hardly know how to answer that, Your Honor, because that was our contention, was that the rule of the institution was that tackle football wasn't permitted. But in the court below, Mr. Ross and his client took the position that the norm at Newcastle was to play tackle football all the time.  And the district court said, well, taking the testimony in the light most favorable to the plaintiff, I'm going to assume that the norm here was tackle football. But it is certainly our position, although there is conflicting evidence on this, I will concede, it's our position that the rule at Newcastle was that the inmates were supposed to play touch football only. As we said in our brief, there are a number of problems with Mr. Bess's Eighth Amendment claim, but the fundamental problem is this. The Eighth Amendment forbids cruel and unusual punishment. Allowing inmates to participate in a recreational activity of their own choosing and at their own initiative cannot reasonably be described as punishment without distorting the ordinary meaning of language. This court and the Supreme Court has repeatedly said that to be actionable under the Eighth Amendment, a condition has to be imposed on an inmate, quote, unwillingly, quote, against his will. It must be, quote, unwanted. But that's not this case. This football game wasn't part of, say, a physical education class that everybody had to participate in. It wasn't even some kind of a sponsored intramural game. This was a bunch of guys getting together a pickup football game on a Saturday morning in their free time. But it was a common activity, wasn't it? And wasn't it a common activity that the guards were fully aware of? Oh, sure. Sure. Although actually the record shows that the most common activity was basketball. But it was common for them to play football as well as to play other sports. But my point is that the ones who wanted to play football that morning played football and the ones who didn't did something else. It was a completely voluntary choice and it was organized at the inmate's own initiative. Oh, sure. They could have. And the rule of the institution is that the inmates, this is a secure facility, a secure unit, and the inmates are always in the presence of the guards. If there is a substantial risk in somebody getting seriously injured in this contact type of aggressive football, don't they have a responsibility to stop it rather than turn a blind eye the other way? They may well have a responsibility under some law, but they do not have a constitutional responsibility. This is not an Eighth Amendment matter. This is at most a matter of negligent supervision, commoner guard negligence, which of course categorically is below the threshold of an Eighth Amendment violation. If I could turn the question around a little bit. If an inmate is exposed to secondhand smoke, that may well be a constitutional problem. If the inmate chooses to smoke himself, that's not an Eighth Amendment violation and it doesn't matter if the inmate wants to smoke a pack a day, two packs a day, five packs a day. If he has emphysema and wants to smoke five packs a day, the degree of the risk isn't what's determinative. It's the fact that this is his own choice. It isn't something that's being imposed on him as a condition of confinement. It's of no moment, I gather, that the guards disregarded the institution's own internal rules prohibiting this type of activity? That's correct. That is not of any constitutional significance. What about the sovereign immunity issue? Section 301 of Title 62 seems to say that this Newcastle Youth Development Center is a state facility. Is that right? Yes, that is correct. And it's part of the State Department of Public Welfare? That is correct. Opposing counsel criticizes your briefing below in the trial court's decision for not applying the three-factor Christie test. And I'm wondering whether the Christie test even applies to a case like this where a statute specifically designates your client as an arm of the state. Well, I don't think it does. I guess the better way to put it is the Christie test is by definition satisfied where you have a case like that. Christie is useful where you have these kind of in-between institutions where it's not entirely clear whether it's an alter ego of the state or not. But here we've got explicit statutory provisions. We have an explicit concession below on summary judgment that this is a state-run institution. And we have case law that repeatedly has held that the Welfare Department, of course, is an alter ego of the Commonwealth. Does the center receive federal funding? Probably. Most parts of the Welfare Department receive some federal funding. Would any of that funding be used to pay a judgment in this case, if there were such a judgment? I don't know. I don't even know if it's possible to segregate that. Federal funds, of course, flow to the Commonwealth, and then they are appropriated, even though they come from the federal government. They are then appropriated by the General Assembly to one department or another. I don't know if in this case those funds would continue to be segregated in a way that would allow anyone to answer that question. But I think the more important point is that who does the judgment operate against? If this money, or if a judgment were paid for from non-federal funds, well, ultimately we would have gotten that money from private citizens, but that doesn't make the Welfare Department a private institution. The mere fact that federal funds may eventually end up paying a judgment doesn't mean that the judgment would flow against, say, the federal government. If you prevail on that argument, the case proceeds against the individuals. That's correct. Do you know if there are hold-harmless agreements in this case? I'm sorry, sir? Hold-harmless agreements? Yes. Well, I'm not sure what you mean by a hold-harmless agreement. We have an indemnification system where, in fact, the judgment would be paid by the Commonwealth, even though as a matter of form the judgment would run against the individuals, but we would indemnify them against the judgment. Maybe as a practical matter it doesn't really make a difference in terms of the liability. In terms of where the money ultimately comes from, I suppose it doesn't, but as a matter of federal law we are quite anxious, of course, to preserve our Eleventh Amendment immunity, and we never waive it. You expressed some uncertainty about the funding. Would you turn to page 707 of the appendix, please? Sure. Do you have it? I want to make sure I'm reading this right. It appears on page 707 that this youth center received only $200,000 in federal funding. Right. Am I reading that correctly? Yes, you are. So over 99% of the funding for this, when you compare the $200,000 to the $26,700,000, that would be less than 1%, I guess. Yes, I think so. I'm at this rate. But it's your position that that doesn't decide the case one way or the other regarding sovereign immunity? Yes, it doesn't matter. What matters is against whom does the judgment go. In this case, the judgment would go ultimately against the Department of Public Welfare, which is part of the state. And as long as we're on the subject of judgments and who pays and so forth, I'd like to just address the question of qualified immunity for one moment. I think the most important fact here is that there is no case, that has ever imposed constitutional liability on a set of facts that is even remotely similar to this case. Did the district court reach the qualified immunity issue? No, the district court decided the case on the merits, although we did raise the issue of qualified immunity. Of course, this court can affirm on any basis. Do you think we can address it if the district court didn't address it? I'm sorry? Do you think we should address it even though the district court did not address it? Well, I think you can. It is a question of law. It's raised below. And you certainly can affirm on any basis it appears in the record. There are only a handful of cases that I was able to uncover where a plaintiff advanced a theory, something like this, and in every one of those cases, the theory was rejected. Before you get into it, and we'll certainly keep that in mind, I understand the facts in this case were that the juveniles requested permission to play football, asked the guards if they could play this type of football, and received permission from the guards. And as I stated before, the guards in fact supervised the game. That's correct. Isn't that sufficient for liability that they were aware that it was a dangerous game, that they knew there was a risk of injury, and they nonetheless disregarded that risk? Isn't that what the Constitution requires? No, because that doesn't get you around the fact that it was still a voluntary activity. It was done by the inmates at their own choice and at their own initiative. And in the same way, prison officials… Well, that would be true if they said, if the center said, let's organize a game, let's choose sides, and this team will play that team. I mean, that's voluntary also. At what point does liability attach? When there's compulsion? Is that what you're saying? Well, sure, that would certainly be enough, and maybe a little bit less than that. Compulsion is enough. Compulsion is enough, certainly. How do we know that it's a substantial risk of serious harm? Let's say there weren't sufficient staff to allow some of the inmates to remain in the barracks, and they all had to go out on the football field. You're admitting that you're liable because there's ipso facto a substantial risk of serious harm? No, and perhaps I misspoke. What I meant to say was compulsion would be enough to get you over that first hurdle, that there's no liability for voluntary activity. If the inmates are choosing to do something on their own, then it's not punishment. And if they were required to do something, and maybe even if the center organized the game, if it was a center-sponsored game, if the center chose who was going to be on what teams, and they set the rules and they organized the whole thing, we might have a different case. I'm really struggling with how we create a rule of law that the lower courts can follow and that litigants can understand that articulates what constitutes a substantial risk. Does there need to be some longitudinal study of incidents at that facility? Is it what's happened statewide, nationwide? How do we unpack that? Of course, that's the next step. Is there a substantial risk of serious harm? Again, I'm not sure I know what to tell you, except that whatever you would need, it's not here. The Supreme Court has said what you need is a risk that is, quote, excessive, a risk that is sure or very likely to come to pass. How about unprotected tackle football? Unprotected tackle? I mean, would you not find from that fact alone that there is a substantial risk of harm? No protective gear and young boys are blamed to tackle football, a violent game. Not when you have a record that goes back at least 10 years and in one defendant's memory 38 years of no serious injuries arising from football games. Okay. Was there any evidence in the trial court from the plaintiff that this type of activity alone speaks of a substantial risk of injury? No. No, there was not. In addition, of course, to there being a substantial risk of injury, and I think this might be germane to Judge Gwente's and Judge Hardiman's points, it also has to be a risk of a type that is contrary to standards of decency in our society. And sure, there is always a risk when you participate in sports that something untoward is going to happen. But it's not the kind of risk that our society finds unacceptable. You've got millions of people playing sports every day inside and outside of prisons. And, yeah, some of them get injured. There is an inherent risk in sports. So you've got all these hurdles. It poses a real evidentiary challenge, though, doesn't it? Because how are we to calibrate what society tolerates? I mean, do we just go by our common sense that people all over the country play football? What if 10 years from now football declines by 50 percent? Are we to consider X games, extreme games where people go on skateboards and flip up into the air 40 feet? I mean, as an evidentiary matter, how are we supposed to analyze that? I think case by case you look at what there is. In the smoking context, the court has looked to municipal ordinances and regulations that have gradually come to forbid smoking in public places. You look to what people do day to day as a matter of common sense. I think that what you look at is going to vary a lot depending on what the circumstances are. But ultimately, I guess it comes down to a question of your own judgment. Is this something that we as a society would find tolerable or not tolerable? Mr. Norton, do you have something further? The only other point I would like to make is that I'd like to follow up on one of Judge Fuente's questions to Mr. Ross in that the rule that Mr. Ross is asking for would indeed put a crimp in athletic pursuits, not just in juvenile facilities, but in prisons as well where the Eighth Amendment applies. And we're talking about not just football, weight rooms, swimming pools, a tremendous number of injuries I find in the case law come from basketball games. And all of that is going to be put at risk by risk-averse administrators under Mr. Ross's rule. I see my time has expired. Thank you, Mr. Norton. Thank you, Your Honor. Mr. Ross. Thank you. I'd like to, if I can, directly answer the question that Your Honor, Judge Hardiman just asked. How are we to calibrate what society will tolerate? What's the standard that the court should set here? I would suggest that the very first step in making that analysis is to look at what the defendants actually believe. What did they believe? And here Mr. Mitchum said he believed it to be an unreasonable risk of harm. Mr. Stewart said, Guard Stewart said, he believed that it rose even to a higher level than the risk of injury in tackle football with equipment where you can be paralyzed. Without equipment, to an even higher level. Defendant Blue said it was obvious and common sense that it presented a danger of, quote, significant risk of injury. So we don't have to start with, well, what would common people outside believe? The rule isn't what society thinks. It's what an individual person who testifies in a deposition says. Well, when you don't have the statements from the individual defendants in the case as to what they believe is Then we have to look at, well, what would society tolerate here so we can figure out whether or not they should have known that information? We don't have to go that step here. They actually admitted to having that very knowledge here. And yet they allowed the activity to go on. Not only did they allow it, they planned it. Defendant Blue. Let me go over that again. How did they admit that they were aware that society would find that this type of activity violates contemporary standards of decency? Defendant Mitchum said that it was an unreasonable risk of harm and that if it went on, he was at fear that these children would be hurt and that he would stop it immediately. And you want us to conclude from that that society itself would find this type of activity as violating standards of decency? No. What I'm saying is, even before we get to, well, what does society believe, I'm suggesting the first step is, what do these defendants believe? Because that's critical to whether or not they should allow the activity. Here, one of the guards actually- They would also figure if there were a competitive boxing occurring on the premises that somebody could get hurt. Everybody knows in boxing somebody could get hurt, but does that mean you cannot allow boxing? It depends. It depends if it's done in a way that they actually believe it rises to a higher level of risk, which is what defendant Stewart said here. It rises to a higher level of risk. So, for example, where you have boxing with headgear, they understand there's a risk. But let's say they're doing extreme, I forget what they call it now, and they have this extreme fighting where they're in cages and they're literally trying to kill each other. Well, when you know that rises to this higher level of risk and you believe it's unacceptable, it's unacceptable. I might agree with you on that last one. It took me a long time. What about sovereign immunity? How do you get around the fact that Section 301 of state law indicates that this is a state entity? I know I should preface that by saying I know that doesn't put you out of court on your individual capacity claims, but it would put you out of court on your official capacity claims. Your Honor, frankly, my only concern about that is the key factor is whether or not this judgment is going to be paid from the state treasury. Now, we asked the question in discovery. The Supreme Court said no. The Supreme Court said all three prongs are equally valid. Okay. But under that factor of whether it's going to come out of the state treasury, we asked the question in discovery, do you have insurance to pay this judgment? We didn't get an answer to that. They didn't say they did. They didn't say they didn't. The Supreme Court said it's a question of who's liable. I mean, the entity against whom you're seeking liability, the Newcastle Youth Development Center, is an arm of the state, is it not? It would appear to be. You know, it appears to be a division of the Department of Public Welfare. And the Department of Public Welfare is an arm of the state, is it not? It is, just as the Pennsylvania Turnpike Commission is an arm of the state, But nonetheless, the court had to do the analysis to see whether or not it gets 11th Amendment immunity. And it focused very seriously on, well, do you have insurance? Can insurance pay this judgment? We don't know that to this day. We still don't know. And many state agencies actually have insurance for different torts that happen, for constitutional violations that happen. We don't know that here. Thank you, Your Honors. Thank you very much. Thank you for your time. Very good arguments presented. We'll take the case under advisement. And we will call.